IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 20, 2014 Session

## IN RE CLOEY R. ET AL.

**Appeal from the Juvenile Court for Rhea County**
**No. 12-JV-61      James W. McKenzie, Judge**

**No. E2014-00924-COA-R3-PT-FILED-JANUARY 21, 2015**

This is a termination of parental rights case, focusing on Cloey R. and Andrea H., the minor children ("Children") of Leonard H. ("Father") and Laura R. ("Mother"). The Children were taken into protective custody by the Tennessee Department of Children's Services ("DCS") on July 26, 2012, upon investigation of environmental neglect and the Children's exposure to controlled substances. On May 16, 2013, DCS filed a petition to terminate the parental rights of Father and Mother. Following a bench trial conducted on November 7, 2013, the trial court granted the petition upon its finding, by clear and convincing evidence, that (1) both parents failed to substantially comply with the reasonable responsibilities and requirements set forth in the permanency plan, (2) Father failed to legitimate Cloey R., and (3) Mother abandoned the Children by willfully failing to visit them for at least four months preceding the filing of the termination petition. The court further found, by clear and convincing evidence, that termination of both Father's and Mother's parental rights was in the Children's best interest. Father has appealed.[1] Upon careful review of the record, we reverse the trial court's termination of Father's parental rights for two reasons: (1) no permanency plan was admitted into evidence upon which the trial court's finding that Father failed to substantially comply with the plan could be based and (2) Father's standing as a putative biological father precluded the application of the statutory ground of failure to legitimate a child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Reversed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and JOHN W. MCCLARTY, J., joined.

---

[1]Mother is not a party to this appeal.

Andrew F. Tucker, Dayton, Tennessee, for the appellant, Leonard H.

Herbert H. Slatery, III, Attorney General and Reporter, and Ryan L. McGehee, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I. Factual and Procedural Background

As pertinent to this action, DCS became involved with the family in response to a July 26, 2012 referral alleging environmental neglect and exposure of the Children to controlled substances. At that time, Cloey was six years old, and Andrea was five years old. The referral was to the home of the maternal grandmother ("Grandmother"), with whom Mother and the Children had been residing. At the time of the referral, Mother was in custody at the Rhea County Jail on drug-related charges, and Grandmother was caring for the Children. The referral alleged that Father was the biological father of the Children, although Mother was still legally married to John K., with whom she had not resided for several years. A third child of Mother's, Trevor K., also resided with Grandmother and was removed into protective custody.[2]

DCS investigator Stephanie Raulston testified that when she investigated Grandmother's home on July 26, 2012, Grandmother was living there with the Children and a man purported to be her husband, D.W. Ms. Raulston described her observations of the home's condition and her interviews with the Children that day as follows:

> Upon arriving at the house, there was broken glass on the front porch under an air conditioner. [Grandmother] answered the door. She let me in the house. There was a hole in the floor about the size of a baseball right next to the front door. I observed feces in the home and a strong smell of urine. They did have some small, what appeared to be, Chihuahua dogs in the home. The home was cluttered. There were roaches on the ceilings, on the walls, coming out of light fixtures in the kitchen, bedroom, living room. There were some dead roaches also observed in different areas of the home. The sink was full of dishes. In the kitchen, there were fifteen canned food items, cereal, Ramen noodles, spaghetti sauce. That was in one cabinet. The refrigerator had mayonnaise, eggs, cheese, and bologna. In the freezer, it had tater tots, Kool-Aid and ice.

---

[2]Trevor K. is not a subject of this appeal.

The girls showed me their room. It was a very small room. It had a twin bed, a dresser, a closet. The closet was empty. It had no clothes in it. There were no sheets on the bed. There were no toys in the room. There were no items on the wall. There was a hole right outside in the wall, which appeared to be a hole from a dryer vent, but it wasn't covered. The children were observed to be dirty. Their clothes were dirty. They didn't know the last time they'd had a bath. Their feet were black, and their hair appeared to be unbrushed for several days, so it was starting to mat.

In the master bedroom, that's where [Grandmother] reported that she stayed. There were clothes piled up so much so that you couldn't see the floor. There was a washer in the hallway. [Grandmother] reported that it did work, and there were clothes piled around the washer.

I interviewed both girls. Cloey reported that her mother . . . was in jail for drugs. She lives with her nanny and her papaw, referring to [Grandmother] and [D.W.]. After she told me her mom was in jail for drugs, I asked her what drugs were. She said she didn't want to talk about it. She said she knows what they are, but she didn't want to talk about it. She said she had not seen her dad, referring to [Father], because he beat up her mom. Cloey said her mom and her dad are not supposed to be around each other.

 I also interviewed Andrea. Andrea also stated she knows what drugs are, but she didn't want to talk about drugs. She said she witnessed her mom and dad punching each other. When asked about the cleanliness of the home, Andrea stated the dogs use the bathroom in the house, but nobody cleans it up, that's why there were feces in the floor and the strong smell of urine in the home. When I asked about their bedrooms and sleeping arrangements, Cloey said she covers up with the blanket, Andrea said she sleeps on the couch. Cloey also disclosed that the home has a lot of bugs and that they bite her. However, I did not observe any bug bites on the parts of her body I could see. She had on shorts and a t-shirt. I don't know what was under the clothes, if she had bug bites on her stomach or anything.

Cloey also reported that her mom sold all of her toys. Because I asked her, you know, where are your clothes? Where are your toys? And she said her mom sold all of her stuff, specifically her toys. So they didn't have any toys.

Ms. Raulston reported that toward the end of the interview with the Children, Cloey asked the investigators to stay until they had dinner because Grandmother would feed the Children if the investigators were there.

When interviewed on the day of the Children's removal, Grandmother stated that she knew her home was inappropriate for the Children. She stated that she had attempted "bug-bombing" the home but was unable to get rid of the bugs. She acknowledged taking hydrocodone for back pain but did not have a prescription. Ms. Raulston administered a drug screen, and Grandmother tested positive for amphetamine, benzodiazepine, methamphetamine, opiates, oxycodone, and marijuana. Ms. Raulston also interviewed D.W., who told her that he and Grandmother tried to keep the home clean but could not. D.W. tested negative for all controlled substances.

As to Father, Grandmother denied knowing his whereabouts. Prior to the July 2012 referral regarding the Children, Ms. Raulston had been investigating a previous referral, received on June 26, 2012, regarding Justice H., another child of Father's by a different mother.[3] Ms. Raulston had been able to contact Father regarding Justice via text message on July 10, 2012, two weeks prior to the instant referral. Father arranged to meet Ms. Raulston at the DCS office as a result of the July 10 message, but he never appeared. Ms. Raulston stated that after waiting for Father until a half-hour past their scheduled meeting time, she attempted to contact him again via telephone and text message, but he did not respond. Father again contacted her via text message on July 18, 2012, to say that he was renting a house and would bring a copy of the lease by the DCS office. Father, however, did not appear at the DCS office at that time and never delivered a copy of the lease. Ms. Raulston subsequently attempted to contact Father when the Children were removed into protective custody, utilizing the number Father had provided during the previous investigation, but the number was out of service.

On the day of the Children's removal, Grandmother gave Ms. Raulston the name of one relative as a possible foster placement, but upon investigation, that relative did not qualify. Grandmother did not offer any other family members as possible foster parents, and the Children were placed in a non-relative foster home. Ms. Raulston subsequently interviewed Mother at the jail on July 27, 2012. According to Ms. Raulston, Mother claimed she did not know Father's whereabouts and was adamant that DCS not place the Children with him due to his abusive behavior.

---

[3]Father testified that he was in the process of divorcing his estranged wife, who was not Justice's mother, but was the mother of a fourth child claimed by Father, Nora. Father stated that he had previously "taken himself to child support court" in an effort to establish visitation with Nora. Neither Justice nor Nora is a subject of this appeal.

Father's first contact with DCS personnel after the Children's removal into protective custody was on August 1, 2012, when he appeared at the DCS office asking for information. Ms. Raulston and her supervisor met with Father on that day. He reported living at a home in Dayton, Tennessee, with a female roommate, C.R. He told Ms. Raulston at that time that he was employed with a local plumbing company, earning approximately $400.00 a week. Father disclosed what Ms. Raulston described as "a pretty lengthy criminal history." He provided a new cellular telephone number and explained that he had been employed at a different job requiring a great deal of overtime when Ms. Raulston had been unable to contact him.

DCS case manager Christina Walsh testified that a permanency plan was established during a child and family team meeting conducted by DCS with both parents on August 23, 2012. Ms. Walsh further testified in detail regarding the parents' responsibilities and requirements as set forth under the permanency plan, and Father acknowledged these responsibilities. No permanency plan was admitted into evidence at trial, however, and no permanency plan is in the record on appeal. The record also contains no date of entry for the trial court's ratification of the permanency plan or its subsequent revision.

According to Ms. Walsh, Father's responsibilities under the plan were to (1) submit to random drug screens, and upon any positive result for controlled substances, undergo an alcohol and drug assessment and follow resultant recommendations; (2) submit to a hair follicle drug screen if required by DCS; (3) ensure that the Children were supervised at all times by an appropriate, sober adult; (4) provide for the basic needs of the Children through a legal income; (5) maintain stable, appropriate housing; (6) resolve all legal issues and abide by all court orders; (7) follow all recommendations of the Children's medical and dental providers; (8) demonstrate involvement in the Children's education, including participation in Cloey's individualized education program ("IEP") meetings, (9) visit with the Children; and (10) pay child support as ordered.

At the time of the Children's removal into protective custody, Father faced a pending charge of arson in Rhea County Circuit Court. He was also subject to what the parties referred to as a "domestic bond" upon an allegation of domestic violence.[4] Subsequent to the establishment of the permanency plan in August 2012, Father incurred drug-related criminal charges in an incident occurring March 12, 2013. According to the Circuit Court judgments presented at the termination hearing, Father subsequently pled guilty to arson and to possession of less than .5 grams of methamphetamine, both Class C felonies, on September 6, 2013. Father was sentenced for these convictions to a combined effective

_____

[4]The record contains no documentation of a domestic assault charge or a related bond or protective order.

sentence of four years, including one year of incarceration and three years of community corrections. Father testified at trial that he expected to be released into community corrections on December 13, 2013, and that he would be serving probation for a total of six years.

Ms. Walsh testified that during the time period that the Children had been in protective custody, Father had been incarcerated October 9, 2012, to October 10, 2012; October 24, 2012, to October 25, 2012; November 2, 2012, through December 4, 2012; December 6, 2012, through February 13, 2013; and March 12, 2013 through the date of trial of November 7, 2013. According to Ms. Walsh, at one point prior to his most recent incarceration, Father was arrested for violating a "domestic bond." Ms. Walsh testified that following the arrest for this violation, Father's visitation with the Children was supervised separately from Mother's visitation by foster parents in Rhea County. Also subsequent to establishment of the permanency plan, Mother was convicted of possession of a schedule II controlled substance, a misdemeanor, on February 12, 2013, and sentenced to eleven months, twenty-nine days of supervised probation.

Ms. Walsh further testified that the Children were adjudicated dependent and neglected as to both parents, an adjudication that, according to the termination petition, was entered by the juvenile court on December 20, 2012. It is undisputed that the permanency plan was revised on April 22, 2013, with Father present and with his responsibilities and requirements remaining essentially the same. Ms. Walsh reported that DCS also added the goal to the revised plan of seeking adoption for the Children in the event that reunification efforts proved unsuccessful. As with the original permanency plan, the revised plan was not admitted into evidence at trial and is not in the record on appeal.

On May 16, 2013, DCS filed a petition to terminate the parental rights of both parents, alleging grounds of (1) both parents' abandonment of the Children through failure to visit, (2) both parents' abandonment of the Children through failure to support, (3) both parents' substantial noncompliance with the permanency plan, (4) Father's abandonment of the Children through wanton disregard for their welfare prior to his incarceration, and (5) as to Cloey, Father's failure to establish paternity. Following a review hearing conducted on August 15, 2013, the trial court found that attempted service of process upon Mother had been ineffective and that Mother had failed to present herself to the court. In its order memorializing this review hearing, entered January 21, 2014, the court appointed counsel to represent Father and attorney Justin Angel as guardian *ad litem* for the benefit of the Children.

On November 7, 2013, the trial court conducted a bench trial, during which Father appeared while in the custody of the Rhea County Jail. At this point, the court found that

Mother had been properly served with notice of the trial, but Mother failed to appear. In an order entered April 15, 2014, the trial court found that grounds existed to terminate the parental rights of both parents. As pertinent to Father's appeal, the court found, by clear and convincing evidence, that Father (1) failed to substantially comply with the reasonable responsibilities and requirements of the permanency plan as to both Children and (2) failed to legitimate Cloey. The court determined that DCS had failed to show clear and convincing evidence that Father abandoned the Children prior to his incarceration. Having found statutory grounds to terminate both parents' rights to the Children, the court further found, by clear and convincing evidence, that it was in the best interest of the Children to terminate both Mother's and Father's parental rights. Father timely appealed.

## II. Issues Presented

On appeal, Father presents four issues, which we have restated as follows:

1. Whether the trial court properly exercised personal jurisdiction in terminating Father's parental rights to Cloey R.

2. Whether the trial court erred by finding clear and convincing evidence that Father failed to substantially comply with the responsibilities and requirements of his permanency plan and was afforded a reasonable time in which to do so.

3. Whether the trial court erred by finding clear and convincing evidence that DCS made reasonable efforts to assist Father in substantially complying with the responsibilities and requirements set forth in the permanency plan.

4. Whether the trial court erred by finding clear and convincing evidence that it was in the best interest of the Children to terminate Father's parental rights.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and

shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State, Dep't of Children's Servs. v. Mims* (*In re N.B.*), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

IV. Personal and Subject Matter Jurisdiction

At the outset of his argument on appeal, Father asserts that the trial court lacked personal jurisdiction over him to terminate his parental rights as to Cloey because "no claim of legitimacy was ever established." Father states that "[t]herefore, this appeal will deal solely with the termination of parental rights between Appellant and Andrea [H.]." Father offers no further authority for his assertion regarding personal jurisdiction. DCS maintains that the trial court properly exercised jurisdiction in terminating Father's parental rights.

DCS, however, fails, as does Father, to distinguish between personal and subject matter jurisdiction. We conclude that the trial court properly exercised both personal jurisdiction over Father and subject matter jurisdiction over his parental rights to Cloey, as well as to Andrea. *See* Tenn. R. App. P. 13(b) (requiring this Court to "consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review").

As our Supreme Court has explained:

> In order to adjudicate a claim, a court must possess both subject matter jurisdiction and personal jurisdiction. *Brown v. Brown*, 155 Tenn. 530, 296 S.W. 356 (1927). Subject matter jurisdiction relates to the nature of the cause of action and the relief sought and is conferred by the sovereign authority which organizes the court. *Cooper v. Reynolds*, 77 U.S. 308, 10 Wall. 308, 19 L.Ed. 931 (1870); *Turpin v. Conner Bros. Excavating Co., Inc.*, 761 S.W.2d 296, 297 (Tenn. 1988). Personal jurisdiction, by contrast, refers to the court's authority to adjudicate the claim as to the person. *Id.*

*Landers v. Jones*, 872 S.W.2d 674, 675 (Tenn. 1994).

As to personal jurisdiction, it is undisputed that Father received proper service of process regarding the petition for termination of his parental rights and that both parents and the Children were domiciled in Tennessee at the time of the petition's filing. Moreover, Father waived any objection to personal jurisdiction by making a voluntary "general appearance" before the court in order to defend the suit on the merits, rather than a "special appearance" for the purpose of contesting personal jurisdiction. *See id.* at 676.

As to subject matter jurisdiction, it is also undisputed that Father claimed at all times throughout the proceedings to be the biological father of both Cloey and Andrea and that he voluntarily entered into a permanency plan on August 23, 2012, to maintain the parental rights he claimed. Regarding the parental rights of a putative biological father, Tennessee Code Annotated § 36-1-117(c) provides in pertinent part:

(c)    The parental rights of the putative biological father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:

* * *

(2)    The biological father has been specifically identified to the petitioners or their attorney, or to the department, the licensed child-placing agency, or the licensed clinical social worker involved in the care, placement, supervision, or study of the child as the child's father by the child's biological mother in a sworn, written statement or by other information that the court determines to be credible and reliable;

(3)    The biological father has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed child-placing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child; provided, that if the biological father has previously notified the department of the biological father's claim to paternity of the child pursuant to the provisions of the putative father registry, § 36-2-318(e)(3), the biological father shall be subject to all the requirements for waiver of notice provisions of § 36-2-318(f)(2) and to all requirements for filing a paternity petition;

(4)    The biological father is recorded on the child's birth certificate as the father of the child;

(5)    . . . or

(6)    The biological father has entered a permanency plan under the provisions of title 37, chapter 2, part 4, or under similar provisions of any other state or territory in which the biological father acknowledges paternity of the child.

*See also In re Bernard*, 319 S.W.3d at 598 (delineating the statutory criteria to qualify an individual as a child's putative biological father).

Father does not dispute the trial court's jurisdiction over the action to terminate his parental rights to Andrea because he was listed as Andrea's father on her birth certificate.

*See* Tenn. Code Ann. § 36-1-117(c)(4). Although the identity of Cloey's biological father was not identified on her birth certificate, Father nonetheless met the relevant statutory criteria of a putative biological father to Cloey at the time of the termination petition's filing because he (1) claimed to be Cloey's father to all parties involved in the action, including DCS, from at least the time of his appearance at the DCS office on August 1, 2012, and (2) entered a permanency plan regarding Cloey on August 23, 2012. *See* Tenn. Code Ann. § 36-1-117(c)(3), (6). In addition, subsection -117(c)(2) arguably would apply to Father despite the lack of a sworn statement from Mother regarding his paternity because the court was presented with "other information," including testimony from Father and DCS personnel, that it clearly deemed "credible and reliable" as to Father's status as a putative biological father. Father need only meet one of the statutory criterion to be considered a putative biological father. *See* Tenn. Code Ann. § 36-1-117(c); *In re Bernard*, 319 S.W.3d at 598. The trial court properly exercised both personal and subject matter jurisdiction in adjudicating this action.

## V. Failure to Legitimate Child

Father does not present the related issue on appeal of whether the trial court erred in finding by clear and convincing evidence that his parental rights to Cloey should be terminated based upon the statutory ground of his failure to legitimate Cloey as his child. We address this issue because DCS has cited the interplay of Tennessee Code Annotated §§ 36-1-117(c) and 36-1-113(g)(9) in its defense of the trial court's proper exercise of jurisdiction and because the trial court cited both code sections in its finding regarding this ground. *See* Tenn. R. App. P. 13(b). Having found that Father qualified as a putative biological father to Cloey at the time of trial, we conclude that the trial court erred by applying the ground of failure to legitimate pursuant to Tennessee Code Annotated § 36-1-113(g)(9)(vi).

Tennessee Code Annotated § 36-1-113 (2014) lists the statutory grounds for termination of parental rights, providing as follows:

> (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.
>
> * * *
>
> (c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tennessee Code Annotated § 36-1-113(g)(9) provides regarding this ground for termination of parental rights in relevant part:

(9)(A)     The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person or, if no such petition is filed, at the time of the filing of a petition to adopt a child, is not the legal parent or guardian of such child or who is described in § 36-1-117(b) or (c) may also be terminated based upon any one (1) or more of the following additional grounds:

* * *

(vi)     The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity by the child's mother, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3); . . .

In finding clear and convincing evidence upon this statutory ground, the trial court stated in relevant part:

[Father] is the presumptive father of Andrea as his name appears as the father on the child's birth certificate. It is uncontroverted that he never followed through with legal legitimation of Cloey, despite his assertion that he had DNA testing, proof of which he never provided, which showed he was the biological father. Cloey is the legal child of [Mother's] former husband and DCS asserts its intention to file the appropriate pleadings against that father. Clear and convincing proof was presented that [Father] failed to legitimate Cloey [R.], as required by law, which is ground for termination of his parental rights pursuant to T.C.A. §§ 36-1-113(g)(9) and 36-1-117(c).

-12-

Although the trial court's reading of the statute is understandable, our Supreme Court has previously held that "[t]he grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9) cannot be used to terminate the rights of a person who is a child's biological parent, legal parent, or putative biological father at the time the termination petition is filed." *See In re Bernard*, 319 S.W.3d at 599. In *In re Bernard*, the Supreme Court delineated the statutory criteria qualifying an individual as a "putative biological father" pursuant to subsection 117(c), as explained above. *Id.* at 598. The Court then isolated the termination of the father's parental rights at issue to one of five children as properly terminated pursuant to Tennessee Code Annotated § 36-1-113(g)(9) because as to that one child only, Father had been proven not to be the biological father prior to the time the termination proceeding was filed and so had no legal relationship to the child. *Id.* at 602. As the *Bernard* Court explained:

> The grounds for termination in Tenn. Code Ann. § 36-1-113(g)(2)-(3) apply to legal parents and putative biological fathers. Accordingly, these grounds for termination apply to Junior D's relationship with Bernard T., Judy T., Joshua T., and Jacquline T. They cannot apply to Junior D.'s relationship with Jordan T. because Junior D. is not Jordan T.'s legal parent, biological parent, or putative biological father. By the same token, the grounds for termination in Tenn. Code Ann. § 36-1-113(g)(9)(A)(iv), (vi) can apply only to Junior D.'s relationship with Jordan T. because, at the time the termination proceeding was filed, Jordan T. was the only child who was neither Junior D.'s biological child, legal child, or putative biological child.

*Id.*; *but see In re Dixie M.M.*, No. M2012-01226-COA-R3-PT, 2012 WL 4474155 at *7-8 (Tenn. Ct. App. Sept. 27, 2012) (affirming the trial court's application of the statutory ground contained in Tenn. Code Ann. § 36-1-113(g)(9)(iii) to terminate a putative biological father's parental rights).

In the instant action, we have determined that Father qualified as a putative biological father to Cloey at the time the termination proceeding was filed pursuant to Tennessee Code Annotated § 36-1-117(c). As the applicable interpretation expressed in *In re Bernard* has not been overturned by the Tennessee Supreme Court, we reverse the trial court's application of Tennessee Code Annotated § 36-1-113(g)(9)(vi) to terminate Father's parental rights to Cloey.

We note also upon our review of the record that subsequent to the instant final judgment, the trial court entered a "Full Guardianship Order," on May 22, 2014, awarding full guardianship of the Children to DCS and noting that an Order of Paternity had been entered in the Rhea County Circuit Court memorializing that DNA testing conducted on

November 2, 2007, proved that Father was the biological father of Cloey. The Guardianship Order also confirms that John K., Mother's husband, surrendered "any parental rights that he might have" to the Children on February 27, 2014. The Order of Paternity was not included in the record, and no date for its entry was offered in the Guardianship Order.

## VI. Substantial Noncompliance with Permanency Plan

In regard to his parental rights to Cloey, Father relies upon his argument that the trial court lacked personal jurisdiction to terminate his parental rights and states in his brief on appeal that his non-jurisdictional issues are presented only as they apply to Andrea. Generally, we restrict appellate review to those issues presented on appeal. *See* Tenn. R. App. P. 13(b). In this case, however, the trial court's findings regarding the statutory ground of substantial noncompliance with the permanency plan affect both Cloey and Andrea. We therefore exercise our discretion to consider this issue as to Father's parental rights to both Children in order to prevent needless litigation, injury to the interests of the Children and the public, and prejudice to the judicial process. *See id.*

Tennessee Code Annotated § 36-1-113(g)(2) provides regarding this ground for termination of parental rights:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

The trial court found clear and convincing evidence that Father failed to substantially comply with the reasonable responsibilities set out in the permanency plan. However, neither the original nor the revised permanency plan was admitted into evidence at trial for the court's consideration. No permanency plan is contained in the record on appeal for our review. This Court has repeatedly held that "when DCS is relying on substantial noncompliance with the permanency plan as a ground for termination of parental rights, it is essential that the plan be admitted into evidence." *In re A.J.R.*, No. E2006-01140-COA-R3-PT, 2006 WL 3421284 at *4 (Tenn. Ct. App. Nov. 28, 2006). For this reason, we reverse the trial court's finding that Father's parental rights to the Children should be terminated based upon his failure to substantially comply with the responsibilities and requirements set out in the permanency plan.

In its findings regarding this issue, the trial court summarized Ms. Walsh's undisputed testimony regarding Father's responsibilities and requirements under the permanency plan. In finding Father in substantial noncompliance, the court stated in relevant portion:

Clear and convincing proof was also presented that [Father] has not substantially complied with the Permanency Plan requirements. He did present certificates of completion for programs he was able to take while incarcerated, but due to his incarceration for all but 40 days of the children's tenure in custody, he has not established stable housing or income for himself, let alone the children. Proof was presented that he has not visited with the children since October 2012, which is primarily due to his incarceration; however, the Court finds that he committed criminal acts and tested positive for methamphetamine and marijuana since the children were placed in custody, knowing that his willful actions would detrimentally affect his ability to be reunified with his children. [Father] remains incarcerated and will have 6 years of probation upon his release. DCS provided clear and convincing [evidence] that [Father] has not substantially complied with the tasks on the permanency plan which is ground for termination of his parental rights pursuant to T.C.A. §§ 36-1-113(g)(2) and 27-2-403(a)(2).

The trial court, however, was not presented during the termination proceedings with the permanency plan upon which DCS relied, nor even with the subsequent revised plan, for its consideration. In *In re A.J.R.*, this Court held that DCS had failed to meet its burden of proof regarding this statutory ground when the original permanency plan containing all of the responsibilities for the mother upon which DCS relied had not been admitted into evidence at trial, even though subsequent revised permanency plans containing some of the same responsibilities had been admitted into evidence. *In re A.J.R.*, 2006 WL 3421284 at *4. As this Court explained:

> *In Dep't of Children's Services v. D.W.J.*, this court made the following pertinent comments, which apply equally to this case:
>
> > Needless to say, the permanency plan must be admitted into evidence before the trial judge can consider it and it must be properly included in the record on appeal before we can consider it. The permanency plan was not admitted into evidence at any time during the trial . . . Tenn. R. Juv. P. 28(c) requires the proper admission of documents into evidence before they can be considered by the trial judge. Although various witnesses referred in their testimony to the permanency plan and its contents, their testimony was only an incomplete and vague description of the contents of the plan. Without the plan in evidence, the trial judge could not have properly made the required factual determinations regarding the plan. Without the

plan in evidence, we do not have an adequate record from which to review the trial court's decision. DCS had the burden of producing clear and convincing evidence that the requirements of the permanency plan involving Mother's children were reasonable and related to remedying the conditions that necessitated the children's removal from her custody; that DCS had made reasonable efforts to assist Mother in complying with the plan; and that Mother had failed to substantially comply with the plan.

*Dep't of Children's Services v. D.W.J.*, No. E2004-02586-COA-R3-PT, 2005 WL 1528367, at *3 (Tenn. Ct. App. E.S., June 29, 2005). As in *D.W.J.*, a case worker in this case testified as to some of the requirements of the plan. This is not sufficient. The permanency plan must be introduced into evidence in a case where termination is sought on ground of substantial noncompliance with the plan pursuant to T.C.A. § 36-1-113(g)(2). Accordingly, we hold that DCS failed to meet its burden of proof regarding its allegations of substantial noncompliance with the permanency plan because the plan was not introduced into evidence and made part of the record.

*In re A.J.R.*, 2006 WL 3421284 at *4-5. *See also In the Matter of B.P.C.*, No. M2006-02084-COA-R3-PT, 2007 WL 1159199 at *8 (Tenn. Ct. App. Apr. 18, 2007) ("In this case, the permanency plan was never admitted into evidence and so cannot form the basis for terminating parental rights."); *In re T.N.L.W.*, No. E2006-01623-COA-R3-PT, 2007 WL 906751 at *5 (Tenn. Ct. App. Mar. 26, 2007) ("Because the initial permanency plan was not introduced into evidence, DCS has failed to prove by clear and convincing evidence its allegations that Mother was in substantial noncompliance with the initial permanency plan.").

As explained in *In re A.J.R.*, the trial court cannot rely upon a DCS case worker's testimony regarding the requirements of the permanency plan when terminating parental rights upon this ground but must actually consider the permanency plan in evidence. *In re A.J.R.*, 2006 WL 3421284 at *5. We therefore conclude that DCS failed to meet its burden of proof regarding its allegations that Father failed to substantially comply with the permanency plan. We reverse the trial court's finding upon this statutory ground as to both Children.[5]

_____

[5]Father also presents what he classifies as a separate issue: whether the trial court erred by finding that he was afforded sufficient time to substantially comply with the permanency plan. We note that Father

(continued...)

-16-

## VII.  Reasonable Efforts by DCS

Father also asserts that the trial court erred in finding that DCS made reasonable efforts to assist him in complying with the responsibilities set out in the permanency plan pursuant to Tennessee Code Annotated § 37-1-166(g)(2014). *See State Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008). ("The State has the burden of proving by clear and convincing evidence that its efforts at reunification were reasonable under all of the circumstances.").  Because DCS was unable to carry its burden of proving the responsibilities required of Father under the permanency plan without admitting the plan into evidence, this issue is pretermitted as moot.  *See, e.g., In re Brandon T.*, No. M2009-02459-COA-R3-PT, 2010 WL 3515677 at *5 (Tenn. Ct. App. Sept. 8, 2010) ("Given the absence of an affidavit of reasonable efforts, relevant permanency plans, or specific proof regarding the permanency plan requirements, the trial court could not properly determine by clear and convincing evidence that DCS had met its burden of proof on reasonable efforts regarding the three oldest children.").[6]

## VIII.  Best Interest of Children

Having determined that the trial court's findings regarding statutory grounds for terminating Father's parental rights to the Children must be reversed, we further determine that the issue of whether termination of Father's rights was in the Children's best interest is pretermitted as moot.  *See In re Audrey S.*, 182 S.W.3d at 878 ("By the time the court reaches the best interests analysis, it will have already made a finding, supported by clear and convincing evidence, that the parent is unfit or poses a risk of substantial harm to the welfare of the child.").

We stress, however, that reversal of the judgment terminating Father's parental rights to Cloey and to Andrea does not affect physical custody of the Children.  We recognize the instability and uncertainty of Father's future at the time of the termination proceedings, including his six years remaining on probation and his previous history of substance abuse and probation violation.  We recognize also the testimony presented at trial that the Children were flourishing in the foster parents' home.  Absent further orders, the trial court's prior order placing the Children in the protective custody of DCS remains in place.

---

[5](...continued)
cites no authority that would prohibit as unreasonable the time period allowed in this case for Father to comply with the permanency plan.  This issue, however, is pretermitted as moot.

[6]We note that while the termination petition contains a sworn statement from Ms. Walsh concerning reasonable efforts exerted by DCS, the record contains no affidavit of reasonable efforts pursuant to Tennessee Code Annotated § 37-1-166(c).

### IX. Conclusion

The judgment of the trial court terminating the parental rights of Father is reversed as to both Children. The judgment of the trial court terminating the parental rights of Mother was not at issue on appeal. Costs on appeal are taxed to the appellee, the Tennessee Department of Children's Services. This case is remanded to the trial court, pursuant to applicable law, for collection of costs assessed below and any further proceedings that may be required.

_____
THOMAS R. FRIERSON, II, JUDGE